**GUST ROSENFELD P.L.C.**
One E. Washington, Suite 1600
Phoenix, Arizona 85004-2553
Telephone: (602) 257-7422
Facsimile: (602) 340-1538
Karl H. Widell – 022758
kwidell@gustlaw.com

**Attorneys for Plaintiff**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deer Valley Unified School District,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>L.P., Student, by and through Parent Krystal Schripsema,<br><br>　　　　　Defendant. | No. CV 11-2297-PHX-ROS<br><br>**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

In opposition to Deer Valley's Motion for Summary Judgment, defendant has applied the wrong standard of review, has misstated the factual record, and has ignored the governing law applicable to a public school district's obligation to provide special education students a "basic floor of opportunity." In essence, defendant has argued that the ALJ's legal errors should simply be overlooked and that the Court need not venture below the surface of the ALJ's decision because only a highly deferential review is necessary. Defendant's position cannot be sustained, and, for the reasons set forth here and in the Motion for Summary Judgment, the administrative decision should be reversed.

### I.   STANDARD OF REVIEW

Defendant has confused two different standards of review in arguing that the ALJ's factual determinations should be reviewed for clear error. The clearly erroneous standard would apply to the Ninth Circuit's review of this Court's factual findings if the

1 case were in that court. *See D.B. v. Esposito*, 675 F.3d 26, 35 (1st Cir. 2012) ("The standard of review applied by the district court to its review of the IHO's decision differs from the standard we apply to our review of the district court's decision."). *Accord Sacramento City Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1402 (9th Cir. 1994). But the case is not before the Ninth Circuit, and, under the proper standard of review, this Court is "<u>not</u> required to review the [ALJ's] findings only for clear error." *See Ashland Sch. Dist. v. Parents of R.J.*, 588 F.3d 1004, 1009 (9th Cir. 2009) (emphasis added).

To the contrary, the standard of review in this case is de novo. *See County of San Diego v. California Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996). Although the ALJ's findings must be considered and given "due weight" as part of that de novo review where they are thorough, careful, and impartial (*but see* Motion at p. 4, n. 2 and p. 7 n. 4), it is for this Court to determine independently how much weight to give them. *See id*. Indeed, this Court may accept or reject the findings in whole or in part. *See Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995). Accordingly, defendant's insistence that the clearly erroneous standard has any application here is both misplaced and telling.

II.   **FACTS**

Both parties have summarized what they consider to be relevant portions of the administrative record in their separately filed statements of fact. Although the case has been presented for determination in a summary judgment format, "[a] summary judgment approach to IDEA cases … is different." *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009). Disputed issues of fact that would otherwise preclude summary judgment often exist in IDEA cases, but those disputes do not prevent summary judgment in this context. *See Wartenberg*, 59 F.3d at 891. Indeed, those disputes are quite literally the point of the district court's de novo review of the

administrative record. *See Ashland Sch. Dist.*, 588 F.3d at 1008. Therefore, while statements of fact are helpful to guide the Court with respect to issues in dispute and facts in the record, they are not dispositive. *See T.Y.*, 584 F.3d at 418. Instead, the Court's inquiry encompasses a review of the entire record in coming to an independent determination under 20 U.S.C. § 1415(i)(2)(C). *See id.*

Given the purpose of a statement of facts in this context, Deer Valley does not believe it will assist the Court to engage in a tit-for-tat effort to show disputed facts. It does submit, however, that the Court should take defendant's statement of facts with a grain of salt. Rather than limit itself to a recitation of facts with citations to the record (as a proper statement of facts would), defendant's statement is littered with argument and innuendo. For example, defendant complains that some of Deer Valley's questions during the hearing were leading. Of course, administrative proceedings in Arizona are not subject to the rules of evidence, A.R.S. § 41-1092.07(F)(1), and, in any event, the ALJ allowed the questions to go forward, presumably in the interest of time. (IR 30, 425:5-8) But more to the point, defendant fails to acknowledge that she was given nearly the entire hearing to develop a case and, despite repeated attempts by Deer Valley to preserve its ability to present a defense, it was not until 4:15 p.m. on day two of a two day hearing that the ALJ finally "jumped in" to announce that the defense would have an hour "to just ask the important stuff." (IR 30, 508:20-509:9)

Similarly, defendant's statement is overflowing with unnecessary and misleading statements. For example, defendant states that Ms. Simmons testified PDAC was a "life skills class" and then points out that Student's IEP did not identify "life skills" needs. (Doc. 22 23:11-13). But for all of defendant's head scratching on this point, what she leaves out is what "life skills" actually are: "Q. What is life skills training? A. Basic keeping ourselves clean, following a routine, asking questions, recognizing emergency supports, knowing our parents' names, knowing where we can get help. Things along

1 those lines." (IR 29, 58:25-59:4) Despite defendant's invitation for it to do so, the Court should not check its common sense at the door in evaluating this case: these are things that all elementary age children need to learn whether they're written into an IEP or not. Defendant may dismiss all of this as "lawyer talk" or complain that it attacks a statement in isolation, but the point is this: the standard of review in this case calls for the Court to engage in an independent assessment of the administrative record that is guided by the parties' factual statements but that is certainly not controlled by them.

### III. IDEA

Remarkably, defendant does not discuss the *Rowley* standard that guides IDEA challenges at all. Instead, she engages in impermissible burden shifting and argues that even if the ALJ applied the wrong legal standard the decision could still be upheld because <u>Deer Valley</u> had the burden to prove that Sierra was not appropriate. (Doc. 21, p. 15 n. 15) This is wrong as a matter of law for two reasons. First, the burden during the due process hearing was on <u>defendant</u> to show that the school she unilaterally chose was appropriate. *See Schaffer v. Weast*, 456 U.S. 49, 51, 126 S. Ct. 528, 531 (2005). But before that burden even came into play, defendant first had the burden to show that Deer Valley's original proposal denied Student a FAPE. *See Parents of R.J.*, 588 F.3d at 1009. If the ALJ came to the wrong conclusion about Deer Valley's offer of FAPE because he applied the wrong legal standard (which he did), then his thoughts about the appropriateness of Sierra simply would not matter because "comparison shopping" of programs is legal error when the public option provides a FAPE. *See Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 659-60 (8th Cir. 1999); *Brad K. v. Board of Educ. of the City of Chicago*, 787 F. Supp. 2d 734, 738 (N.D. Ill. 2011).

Defendant also attempts to shift the burden to Deer Valley with respect to testimony in the area of communication. (Doc. 21, p. 8 n.7) Putting aside the fact that Deer Valley did present relevant evidence by witnesses with actual applicable

credentials (and defendant did not), the burden to show a violation was on defendant at the hearing. *Supra*. If defendant failed to meet her burden at hearing, Deer Valley technically was not obligated to present any case at all. But it did, and the Court's independent review of the record will confirm that the preponderance of the evidence supports the conclusion that Deer Valley met its obligations under IDEA and *Rowley* to provide Student with special education that offered him a "basic floor of opportunity."

## IV.   THERE WAS NO IDEA PROCEDURAL VIOLATION.

Defendant apparently wants to bury the lead in this case by treating the ALJ's conclusion that Deer Valley committed a procedural violation entitling her to relief (IR 28, p. 17 ¶ 15) as a subsidiary issue and suggesting that the Court should not bother with it. But that procedural issue is at the heart of the dispute in this case, and, indeed, was the driving force behind the ALJ's decision. (IR 28, p. 17 n. 105, p. 17 n. 104) Moreover, the Supreme Court and Ninth Circuit have instructed that the starting point for a court to review a school district's compliance with its obligations under IDEA is with procedural requirements. *See J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (quoting *Rowley*). The issue is squarely before the Court and the ALJ's decision should be reversed for two reasons. First, it is simply wrong as a matter of law. Second, a correct statement of the law on this issue needs to govern procedure in Arizona.[1]

As defendant's argument concedes, what the ALJ has done is create a situation in which public school districts will face liability unless they start inviting third parties from outside private schools (who may or may not agree to participate on their own schedules and in their own time) into the process: "representatives from available schools should be invited to present their programs to the IEP team who should then

---

[1] According to the decision, the ALJ's individual determination that IEP teams must choose bricks and mortar school locations for students "is the current ruling on that issue in Arizona, and will continue to be unless it is overturned by the courts." (IR 28, p. 17 n.14)

1768444                                              5

make the placement decision in the first instance." (Doc. 21, 11:20-12:1) Not only is the IDEA devoid of any such requirement, defendant's argument shows how unworkable the ALJ's formulation of IEP development procedure is.[2]

On the merits, defendant has not made a convincing showing that this Court should stray from the overwhelming authorities holding that the selection of a bricks and mortar school location is reserved as an administrative decision. She has two arguments. First, she says Deer Valley was simply covering its tracks in following the procedures that it did. Second, she says there's something unique about special schools on the continuum of alternative placements to change how their selection should take place.

The first argument is a sideshow. If what a school district did was proof of what the school district was supposed to do, there would never be a reason to review a school district's actions. In any event, that Deer Valley was stuck trying to incorporate the ALJ's previous administrative decision, *J.H. v. Coolidge Unified School District*, into how the law is actually supposed to work is not seriously in question, and factually defendant is once again off course. Defendant's own representatives brought the case up during IEP meetings to discuss school location. (IR 23, P260 & P261) Furthermore, her track-covering argument is anchored in part in her claim that it was between receiving prior written notice that Student would attend PDAC and the meetings that followed that she gave her notice of unilateral placement to Deer Valley. (Doc. 21, 11:1+) But that's not how it happened. Her own exhibits demonstrate that her written notice of unilateral placement was given <u>before</u> the team even reached the decision to move to special schools on May 5, 2011. (IR 23, P126 (dated 4/22/11)) Her notice

---

[2] There were 33 schools on the Arizona Department of Education's list of approved private special education day schools during the 2011-2012 school year. (IR 23, P365-P376)

prompted the initial meeting on May 5, not the meetings that followed to discuss location.³

The second argument represents the classic distinction without a difference. For starters, defendant calls the special schools level of the continuum "the most restrictive of placements." (Doc. 21, 10:14-16)  They are not.  Home instruction and instruction in hospitals and institutions are both far more restrictive than special schools.  *See* 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.115(b)(1).  What defendant appears to suggest is that because special schools are more restrictive than general education schools, they must require a certain additional degree of oversight by the IEP team in their selection. But even though parents and their representatives may often have strong preferences and desires to pick the schools their children will attend, they do not have the legal right to do so.  This is true even for the more restrictive level of residential treatment (i.e. institutionalization).  Under Arizona law, the IEP team does not decide the bricks and mortar location for a residential treatment student.  *See* A.R.S. § 15-765(J) ("The state placing agency shall consider the recommendations of the individualized education program team in selecting the specific residential facility.").  Defendant's argument that the level of restriction in special schools requires the IEP team to make a bricks and mortar school selection is completely inconsistent with the fact that the IEP team is clearly not in control of school selection at the next less restrictive level nor at the next more restrictive level of the continuum of alternative placements.

Defendant's own cases are in accord with Deer Valley's position. For example, the district court in *Carrie I. v. Department of Education*, -- F. Supp. 2d --, 2012 WL 2353850, *11-12 (D. Haw. May 31, 2012), expressly held that there is no IDEA

---

³ Deer Valley acknowledges that defendant's current lawyer did not represent her during the administrative proceedings and did not participate in the development of the factual record, which may explain divergence from it.

1 procedural requirement to hold an IEP team meeting to pick a brick and mortar school: "even if there was no meeting to discuss Aiea High's particulars, the IDEA does not require such a meeting (much less a meeting that must be held with parental participation) just to resolve the location of an LRE." *Carrie I.* is consistent with Deer Valley's argument that the ALJ and defendant are confusing a procedural issue with a substantive one. This was also the teaching of *Brad K.*, in which the district court rejected defendant's other case (*Madison Metro. Sch. Dist. v. P.R.*) based on an analysis consistent with the Ninth Circuit's precedent in *N.D. v. Hawaii Department of Education*, 600 F.3d 1104, 1116 (9th Cir. 2010) (distinguishing "educational placement" from bricks and mortar location). *See* 787 F. Supp. 2d at 740.[4] *See also Johnson v. District of Columbia*, -- F. Supp. 2d --, 2012 WL 883125, *5 (D.D.C. Mar. 16, 2012) ("The fundamental flaw in Plaintiffs' argument is the underlying assumption that M.J.'s 'educational placement' is the physical school he attends."). The strongest case defendant can muster is the *J.H. v. Coolidge* administrative decision itself, but the same ALJ doubling down on the same erroneous legal conclusion in his next case is not persuasive when faced with the tidal wave of authority flowing in the opposite direction.

The ALJ's conclusion that Deer Valley violated IDEA by administratively selecting a bricks and mortar school location for Student cannot be upheld because it is wrong as a matter of law. Accordingly, defendant was not entitled to the relief she was granted, and Deer Valley is entitled to summary judgment in its favor reversing the ALJ's decision and holding that there was no procedural violation in this case.

---

[4] Defendant challenges Deer Valley's citation to *Brad K.*, arguing that it "is not precedent." (Doc. 21, p. 14 n.14) The argument is without merit. First, the decision was published in the *Federal Supplement* and the fact that the district courts in Illinois style their decisions as orders and memorandum opinions is of no moment. *See Krull v. Celotex Corp.*, 827 F.2d 88, 81-83 (7th Cir. 1987). Defendant appears to be confusing the rules applicable to district court decisions as opposed to circuit court decisions. District court decisions are persuasive authority whether they are published in the *Federal Supplement* or not. *See Williams v. Gunderson Rail Svcs, LLC*, No. 07-0887, 2008 WL 145251, *2 (W.D. La. Jan. 14, 2008).

## V. ANY PROCEDURAL VIOLATION WOULD HAVE BEEN HARMLESS.

Defendant dismisses the need for a harmless error analysis based on the ALJ's determination of a substantive IDEA violation. (Doc. 21, p. 3 n. 3) But this argument puts the cart before the horse for the same reason discussed above: the starting point for a court to review a school district's compliance with its obligations under IDEA is with procedural requirements. *See J.L.*, 592 F.3d at 951 (quoting *Rowley*).

Here, the ALJ found a specific procedural violation that he deemed to constitute a violation of FAPE, and he granted relief because of it. (IR 28, p. 17 ¶ 15) Of course, there will ultimately be no need for the Court to reach the harmless error question when it concludes that the ALJ erred in finding a procedural violation in the first place. But to the extent there was a procedural error determination below, the ALJ also committed reversible error for failure to conduct a harmless error analysis, which, as demonstrated in the motion, would have avoided any liability on Deer Valley's part.

## VI. THERE WAS NO IDEA SUBSTANTIVE VIOLATION.

The sole basis for concluding that PDAC could not implement Student's IEP was the ALJ's speculative and unsupported conclusion that Student needed classmates who could talk (and apparently talk a lot) to work on two specific goals: greetings and turn taking. The preponderance of the evidence dictates reversal for two reasons.

First, the only evidence from a licensed speech language pathologist was that a student could work on greetings and turn taking with students with limited verbal skills, including students with augmentative communication devices. This is really common sense, but Ms. Rouse took the time to explain how students at varying communication levels could work together. (IR 30, 414:16-415:3) The point is that the two goals the ALJ focused on were <u>pragmatic</u> in nature. (IR 23, P105) They were meant to improve social communication with others, and that includes engaging with students at all levels of the communication spectrum. (IR 30, 419:3-18) To the extent defendant argues that

1  Ms. Rouse only testified about initiating greetings and that Student's goal was to
2  respond to greetings, she is asking the Court to leave its common sense at the door.
3  Responding to a greeting is the flip side of initiating a greeting, and there is no
4  difference between responding to a vocal greeting from a human voice box and a vocal
5  greeting from a communication device.  Pragmatically, they accomplish the same result.
6  To conclude, as the ALJ did, that Student could not work on these two communication
7  goals without the presence of "higher functioning" peers is simply not supported by the
8  evidence and indeed contrary to the only credentialed individual who testified at the
9  hearing.  At best, the conclusion is based on a weighing of which group of peers the
10 ALJ thought would be <u>better</u>.  That was the approach Dr. Jordan and, to a more limited
11 degree, Dr. Davey took, but that's not the standard and it was error for the ALJ to reach
12 a conclusion based on it.

13      Second, the debate over the level of necessary communication peers was
14 ultimately academic because the evidence showed the peers Student would have been
15 with at PDAC were verbal and appropriate for his educational setting.  As an initial
16 matter, Ms. Simmons testified that her class engaged in exactly the kinds of activities
17 Student's pragmatic goals focused on, including "social activities where we're engaging
18 in games, turn taking, learning how to wait, learning how to ask appropriately for
19 certain things."  (IR 29, 62:24-63:1)  More than that, though, Ms. Simmons testified that
20 her students were in a range of communication skills, three of four of whom spoke
21 independently with reciprocal language.  (IR 29, 45:15-24)  They were able to answer
22 "wh" questions (who, what, when, where) and could verbally sequence a story without
23 an augmentative communication device.  (IR 29, 45:25-46:9)  And keeping in mind that
24 these are special education students, Ms. Simmons testified that two were at grade level
25 in comprehension, one was one grade level below, and only one was more significantly
26 below grade level.  (IR 29, 66:18-22)

1  The only possible way the ALJ was able to reach the conclusion he did was to 2 completely ignore the testimony of the teacher who is in the classroom every day and to 3 rely instead – as does defendant in her unavailing attempt to uphold that conclusion – on 4 the testimony of the parent, who only visited once for a short period of time (IR 29, 5 71:13-18), and the parent's friend (IR 29, 204:3-7), who had no speech language 6 credentials yet who purported to diagnosis and evaluate the communication abilities of 7 the PDAC's students based on her own limited observations (IR 29, 213:3-13).  This 8 was error.  Whatever parent's and her friend's limited insights might have been, Ms. 9 Simmons met Student and was aware that he had "very strong communication skills." 10 (IR 29, 72:5-10)  Because of this or despite it, she thought he fit into PDAC.  (IR 29, 11 73:24-74:7)  Again, the Court should not check common sense at the door.  The fact that 12 a parent who visited a classroom for ten minutes didn't personally observe students 13 talking does not mean they are incapable of communication.  The leap is preposterous 14 and can't be supported in light of the evidence.

15  The ALJ's determination of a substantive violation in PDAC's ability to 16 implement two goals in the IEP was nothing more than the natural extension of his 17 defense of the *J.H. v. Coolidge* decision that came before.  Based on the preponderance 18 of the evidence, PDAC provided a "baseline of opportunity" for Student to work on <u>all</u> 19 of his IEP goals.  Indeed, Dr. Davey agreed based on Ms. Simmons' testimony (no 20 matter how much defendant would like to forget it).  Accordingly, the Court should 21 enter summary judgment in Deer Valley's favor and hold that its offer to provide special 22 education to Student at PDAC provided him FAPE and met its obligations under the 23 IDEA.

24 **VII. SIERRA DID NOT MEET STUDENT'S NEEDS.**

25  Defendant pulled her child from the public schools and unilaterally enrolled him 26 in a private school.  Now she wants the public to pay for that decision by reimbursing

1  her the tuition she paid to do it.  At the same time, she brushes aside the fact that the
2  school she picked did not provide her child the very communication services that the
3  ALJ relied on in granting her financial <u>reimbursement</u> by claiming an inability to pay.
4  If she was unable to pay, did not pay, and did not receive the services the ALJ relied
5  upon in granting reimbursement, what is the public paying for?

6        Defendant argues that Sierra provided student with speech in an "integrated way"
7  but admits that he did not receive speech therapy from a speech language pathology
8  provider as required by the IEP.  (Doc. 21, 17:2-5)  Her argument is nothing more than
9  reality avoidance.  From one side of the mouth, she argues that an IEP must be
10 evaluated in connection with the words on the page (Doc. 21, p. 6 n. 6), but from the
11 other side she argues that it doesn't matter if her preferred school did not follow those
12 words.

13       The ALJ's decision focused on Student's work on two particular communication
14 goals.  (IR 28, ¶ 12)  As they are written in the IEP, those two goals require therapy
15 from a speech language pathologist (SLP), speech language therapist (SLT), or speech
16 language pathologist assistant (SLP-A).  (IR 23, P125)  There are no other providers
17 listed as appropriate to work on those goals.  Indeed, the written IEP also specified
18 speech language therapy in connection with all of Student's other communication goals
19 (there were five more) (IR 23, P105-P106), two of his language arts goals (IR 23,
20 P102), and one of his social emotional goals (IR 23, P107).  To make progress on those
21 goals, the IEP provided for 270 minutes per month of <u>direct</u> speech therapy as a related
22 service.  (IR 23, P112)  Thus, there is no real question that speech therapy was vital to
23 meeting Student's individual needs.  Yet, Sierra didn't provide any.

24       To be clear: the ALJ rejected Deer Valley's offer to educate Student at PDAC
25 where speech therapy was provided four days a week by a credentialed speech language
26 pathologist (PSOF ¶ 21) and instead ordered Deer Valley to reimburse tuition paid to

Sierra for a program that did not provide any speech language therapy to Student as required by his IEP. Meanwhile, the only basis for doing so was expressly that he didn't think PDAC could implement two of Student's communication goals in a manner that would allow him to make progress on them. The decision is so utterly divorced from reason that it cannot be sustained. There is no logical progression from "school district, you cannot provide for communication goals as written in the IEP" to "school district, you must pay for tuition at a private school that is not providing for communication goals as written in the IEP." Accordingly, the ALJ's conclusion that Sierra was appropriately meeting Student's needs such that Deer Valley must pay for it should be reversed and summary judgment entered for Deer Valley.

**VIII. CONCLUSION**

After an independent de novo review of the administrative record in this case, the Court should hold that the ALJ erred in finding procedural and substantive violations of IDEA that entitled defendant to relief. Specifically, for the reasons set forth, the Court should hold that Deer Valley's administrative decision to educate Student at PDAC was within its discretion as an IDEA procedural matter and that the substantive offer to educate Student at PDAC provided him a FAPE.

The preponderance of the evidence simply does not support the ALJ's decision. Accordingly, the Court should grant Deer Valley summary judgment reversing the ALJ's decision and concluding that Deer Valley met its obligations under the applicable legal standards.

RESPECTFULLY SUBMITTED this 19th day of July 2012.

                GUST ROSENFELD P.L.C.

                By *s/ Karl H. Widell - # 022758*
                   Karl H. Widell
                   Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and an electronic copy was transmitted to the following ECF registrants:

Amy Langerman
951 Coronado Avenue
Coronado, CA 92118
*Attorney for Defendant*

 /s/KHW

1768444

14